# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 1, 2005　　　　　Decided October 20, 2006

No. 04-1291

ENVIRONMENTAL DEFENSE, ET AL.,
PETITIONERS

v.

ENVIRONMENTAL PROTECTION AGENCY AND
STEPHEN L. JOHNSON, ADMINISTRATOR, ENVIRONMENTAL
PROTECTION AGENCY,
RESPONDENTS

On Petition for Review of an Order of the
Environmental Protection Agency

*Robert E. Yuhnke* argued the cause and filed the briefs for petitioners.

*Natalia T. Sorgente*, Attorney, U.S. Department of Justice, argued the cause for respondent. With her on the brief were *John C. Cruden*, Deputy Assistant Attorney General, and *Sara Schneeberg*, Attorney, U.S. Environmental Protection Agency.

Before: RANDOLPH, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In this petition for review, Environmental Defense Fund, Natural Resources Defense Council, Sierra Club, and Transportation Solutions Defense and Education Fund ("petitioners") challenge three sets of regulations promulgated by the Environmental Protection Agency ("EPA") governing how states are to bring their transportation plans into conformity with the requirements of the Clean Air Act (the "Act"). 42 U.S.C. § 7401 *et seq*. One set of regulations, which appears at 40 C.F.R. § 93.118(b), (d), and (e)(6), was issued in 1997 and not addressed in the 2004 rulemaking under review.[1] We do not have jurisdiction to review petitioners' challenge to this set of regulations because the statutory period for judicial review has long since passed. We grant the petition with respect to 40 C.F.R. § 93.109(e)(2)(v), because it is inconsistent with the Act's requirement that activities that emit pollutants comply with an approved transportation implementation plan. Finally, we deny petitioners' challenge to 40 C.F.R. § 93.119(b)(2), (d), and (e), because the Act does not require that activities involving transportation actually reduce pollutants, but merely that they not frustrate an implementation plan's purpose to reduce overall emissions.

**I.**

In enacting the Clean Air Act, Congress found "that air pollution prevention (that is, the reduction or elimination, through any measures, of the amount of pollutants produced or

---

[1] *See* Transportation Conformity Rule Amendments for the New 8-hour Ozone and PM2.5 National Ambient Air Quality Standards and Miscellaneous Revisions for Existing Areas; Transportation Conformity Rule Amendments: Response to Court Decision and Additional Rule Changes, 69 Fed. Reg. 40,004 (July 1, 2004) (the "Final Rule").

created at the source) and air pollution control at its source is the primary responsibility of States and local governments." 42 U.S.C. § 7401(a)(3). Accordingly, the Act seeks "to encourage and assist the development and operation of regional air pollution prevention and control programs." *Id.* § 7401(b)(4). It does so by "establish[ing] a joint state and federal program for regulating the nation's air quality." *Envtl. Def. Fund v. EPA*, 167 F.3d 641, 643 (D.C. Cir. 1999). At the federal level, the Act requires EPA to promulgate National Ambient Air Quality Standards ("NAAQS"), which seek to promote and maintain public health by establishing maximum limits for various air pollutants. *See* 42 U.S.C. § 7409. As it determines what is necessary to protect the public health, EPA may revise existing NAAQS or promulgate NAAQS for new pollutants, thus creating new limits which states must subsequently work to meet. *See id.* § 7409.

States, in turn, are required to adopt State Implementation Plans ("SIPs") that "provide[] for implementation, maintenance, and enforcement of [NAAQS] in each air quality region." *Id.* § 7410(a)(1); *see also id.* § 7407(a) (requiring each state to submit a SIP for each air quality control region within its borders). SIPs, which are sometimes also referred to in the statutes and regulations as "implementation plans," chart a course for reducing pollutant emissions by requiring states to "include enforceable emission limitations and other control measures, means, or techniques . . . , as well as schedules and timetables for compliance, as may be necessary or appropriate to meet the applicable requirements" of the Act. *Id.* § 7410(a)(2)(A). Though created by the states, SIPs do not take effect until approved by EPA. *See id.* § 7506(c)(1).

As we have previously described, "[i]n 1977, Congress amended the Clean Air Act to ensure that transportation planning at the local level conforms to pollution controls contained in approved SIPs." *Envtl. Def. Fund v. EPA*, 167 F.3d

at 643. "[B]ecause federal agencies 'largely ignored'" the 1977 amendments, Congress amended the Act again in 1990 to expand the content and scope of the conformity requirements. *Id.* at 643 (quoting Clean Air Conference Report, 136 Cong. Rec. 36,103, 36,105-06 (1990)) (ellipsis omitted). Thus, today, after a SIP is approved by EPA and is in force in an area, no department of the federal government may

> engage in, support in any way or provide financial assistance for, license or permit, or approve, any activity which does not *conform* [to the SIP] . . . . Conformity to an implementation plan means--:
>
> (A) conformity to an implementation plan's *purpose of eliminating or reducing* the severity and number of violations of the national ambient air quality standards and achieving expeditious attainment of such standards; and
>
> (B) that [transportation] activities will not—
>
> (i) cause or contribute to any new violation of any standard in any area;
>
> (ii) increase the frequency or severity of any existing violation of any standard in any area; or
>
> (iii) delay timely attainment of any standard or any required interim emission reductions or other milestones in any area.

42 U.S.C. § 7506(c)(1) (emphasis added). This definition of conformity and EPA's attempts to promulgate regulations

implementing it have been before this Court several times. *See, e.g., Envtl. Def. Fund v. EPA*, 82 F.3d 451, 454 (D.C. Cir. 1996) ("*EDF I*"); *Envtl. Def. Fund v. EPA*, 167 F.3d at 643 ("*EDF II*"); *Sierra Club v. EPA*, 129 F.3d 137, 138 (D.C. Cir. 1997).

Petitioners in this case challenge three sets of EPA regulations that implement this statutory conformity provision with respect to a specific transportation planning process required by the Urban Mass Transportation Act. "Under the Urban Mass Transportation Act, the governor of each state, in agreement with local officials, must designate a metropolitan planning organization (known as an 'MPO') for each urban area with more than 50,000 people." *EDF II*, 167 F.3d at 644 (citing 49 U.S.C. § 5303(c)(1)). As we have explained,

> [t]he MPO plans for the transportation needs of that area. It develops a long range transportation plan . . . which specifies the facilities, services, financing techniques, and management policies that will comprise the area's transportation system over a 20-year period, *see id.* § 5303(f), as well as a short-term transportation improvement program . . . which identifies and prioritizes the specific transportation projects to be carried out over the next three years, *see id.* § 5304(b).

*EDF II*, 167 F.3d at 644.

The Clean Air Act's 1990 conformity requirements give SIPs, once in effect, added bite by requiring that "[n]o [MPO] . . . shall give its approval to any project, program, or plan *which does not conform to an implementation plan* approved or promulgated under section 7410 of this title," and by conditioning federal approval upon conformance to a SIP. 42 U.S.C. § 7506(c)(1) (emphasis added).

## II.

The judicial review provision of the Clean Air Act provides that

> a petition for review of action of the Administrator in promulgating any national primary or secondary ambient air quality standard . . . or any other nationally applicable regulations promulgated, or final action taken, by the Administrator under this chapter may be filed only in the United States Court of Appeals for the District of Columbia.
>
> * * *
>
> Any petition for review under this subsection shall be filed *within sixty days* from the date notice of such promulgation, approval, or action appears in the Federal Register . . . .

42 U.S.C. § 7607(b)(1) (emphasis added). EPA published the final rule at issue here on July 1, 2004 (the "2004 Rule"), and petitioners filed a petition for review within sixty days.

In their brief, petitioners challenge three of EPA's regulations in the 2004 Rule: 40 C.F.R. § 93.109(e)(2)(v); 40 C.F.R. § 93.119(b)(2), (d), and (e); and 40 C.F.R. § 93.118(b), (d), and (e)(6). With respect to the first two regulations, EPA concedes, and we agree, that petitioners have made a timely challenge to new regulations first announced in the final rule. There is no dispute that we thus have jurisdiction pursuant to 42 U.S.C. § 7607(b)(1) to hear the challenge to 40 C.F.R. § 93.109(e)(2)(v) and 40 C.F.R. § 93.119(b)(2), (d), and (e), and we will discuss the merits of those challenges shortly. But

a jurisdictional issue has been raised with respect to the third regulation petitioners challenge, 40 C.F.R. § 93.118(b), (d), and (e)(6), and we discuss that first. Parts of this regulation were promulgated in 1993, parts in 1997; but none of it originated in the 2004 rulemaking now under review. *See* Criteria and Procedures for Determining Conformity to State or Federal Implementation Plans of Transportation Plans, Programs, and Projects Funded or Approved Under Title 23 U.S.C. or the Federal Transit Act, 58 Fed. Reg. 3768, 3783 (Jan. 11, 1993); Transportation Conformity Rule Amendments: Flexibility and Streamlining, 62 Fed. Reg. 43780, 43810-12 (Aug. 15, 1997) (the "1997 regulation"). Petitioners did not file this petition for review within sixty days of the promulgation of this regulation. Thus, EPA contends we are without jurisdiction to hear petitioners' belated challenge to it.

The 2004 Rule made only minor changes to the 1997 regulation, which petitioners do not challenge. Instead, they seek review of the 1997 regulation itself, which they cannot now do. Petitioners make two arguments in an effort to sustain their challenges. First, they argue that they "filed a request that EPA amend its 1997 regulations." Pet. Reply Br. at 18. Petitioners seek the benefit of

> this circuit's long-standing rule that although a statutory review period permanently limits the time within which a petitioner may claim that an agency action was procedurally defective, a claim that agency action was violative of [sic] statute may be raised outside a statutory limitations period, by *filing a petition for amendment or rescission* of the agency's regulations, and challenging the denial of that petition.

*Kennecott Utah Copper Corp. v. U.S. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996) (quoting *Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 152 (D.C. Cir. 1990)) (emphasis added); *see Natural Res. Def. Council v. Nuclear Regulatory Comm'n*, 666 F.2d 595, 601-02 (D.C. Cir. 1981). This argument cannot save petitioners' challenge to the 1997 regulations because they did not file a petition for amendment or rescission of EPA's regulations as required by *Kennecott*. The best they can show is a single comment made by one petitioner in the present rulemaking arguing that one aspect of the 1997 regulations—not even the one at issue here—should be revised. We have never held that the *Kennecott* rule applies when a petitioner has not filed a petition for amendment or rescission, but has only offered a comment on a matter not actually at issue, and we will not do so here. Such a holding would not only contravene *Kennecott*, but it would also circumvent our precedent on the reopening rule, invoked by petitioners' next argument.

"[W]ell-established in this circuit," the reopening rule is "an exception to statutory limits on the time for seeking review of an agency decision." *Nat'l Ass'n of Reversionary Property Owners v. Surface Transp. Bd.*, 158 F.3d 135, 141 (D.C. Cir. 1998) (quoting *United Transp. Union-Ill. Legislative Bd. v. Surface Transp. Bd.*, 132 F.3d 71, 75-76 (D.C. Cir. 1998)) (alterations and quotation marks omitted). "[T]he period for seeking judicial review may be made to run anew when the agency in question by some new promulgation creates the opportunity for renewed comment and objection." *State of Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C. Cir. 1988). We cannot find any evidence of a "new promulgation" that would create "an opportunity for renewed comment and objection." Petitioners concede that the regulatory language in section 93.118(b) and (d) that they wish to challenge was not revised. Pet. Br. at 1-2. They also do not argue that section 93.118(e)(6) was amended in the 2004 Rule. They argue instead that during the course of

the 2004 rulemaking, EPA constructively reopened section 93.118(b) and (d) by reinterpreting their provisions without notice. Pet. Reply Br. at 19-22. A regulation may be constructively reopened when an agency or court changes the regulatory context in such a way that could not have been reasonably anticipated by the regulated entity and is onerous to its interests. *Kennecott*, 88 F.3d at 1214-15. An official interpretation of a regulation may trigger a reopening. *See Public Citizen v. NRC,* 901 F.2d 147, 151 (D.C. Cir. 1990).

Petitioners, however, present no evidence that EPA has ever reinterpreted section 93.118 since it was promulgated in 1997. Their reliance upon an unpublished opinion in a case they brought before the Eleventh Circuit, *Sierra Club v. Atlanta Regional Comm'n*, No. 02-11652 (11th Cir. Oct. 30, 2002), is of no help to their argument. Petitioners allege that EPA's argument in *Sierra Club* signaled a change in the Agency's interpretation from its initial promulgation in 1997. It is curious that petitioners would cite to this case as evidence in support of their claim, given that the Eleventh Circuit found EPA's interpretation in *Sierra Club* to be a proper application of section 93.118 under a plain reading of the Clean Air Act's conformity requirements. Even in the face of a citation in the Eleventh Circuit opinion that establishes that EPA's argument in *Sierra Club* was consistent with its 1997 rule, *see* Transportation Conformity Rule Amendments: Flexibility and Streamlining, 61 Fed. Reg. 36,112, 36,118-19 (proposed Jul. 9, 1996), and thus no reinterpretation had occurred, petitioners claim that the Agency changed its position with respect to this regulation between 1997 and 2002, when *Sierra Club* was litigated. This change, they maintain, was "formally adopted" in 2004, and therefore triggers reopening of the period to challenge the regulation. Pet. Reply Br. at 22. But in arguing that such a change has occurred, petitioners' provide only their *own* interpretation of the 1997 rule as evidence of the *Agency's* interpretation. To be sure, their understanding of 93.118 was

inconsistent with EPA's interpretation when the regulation was promulgated in 1997, when it was advanced by EPA in *Sierra Club*, and when it was part of the 2004 rulemaking. But petitioners' showing of its differences with EPA's interpretation misses the mark. We require evidence that an interpretation adopted by EPA prior to the 2004 rulemaking differed with its own current interpretation. Petitioners have not met their burden of proving that EPA either changed the regulatory context in such a way that could not have been reasonably anticipated by the regulated entity and was onerous to its interests, *see Kennecott*, 88 F.3d at 1214-15, or officially reinterpreted the regulation, *see Public Citizen* 901 F.2d at 151.

## III.

In reviewing petitioners' challenges to § 93.109(e)(2)(v) and 40 C.F.R. § 93.119(b)(2), (d), and (e), we apply *Chevron*'s familiar two-step inquiry. We begin by asking "whether Congress has directly spoken to the precise question at issue." *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984). If so, "that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." *Id.* at 842-43. If, however, "the statute is silent or ambiguous with respect to the specific issue," we will defer to the agency's reasonable construction of the statute. *Id.* at 843.

A. *40 C.F.R. § 93.109(e)(2)(v)*

We start with petitioners' challenge to 40 C.F.R. § 93.109(e)(2)(v), which establishes interim tests for demonstrating conformity to newly-revised ground-level ozone NAAQS. The Clean Air Act mandates that EPA promulgate

NAAQS to "protect the public health." 42 U.S.C. § 7409(b)(1). EPA is required to review the NAAQS every five years and revise them if necessary. *Id*. § 7409(d)(1). Because a SIP's purpose includes "eliminating or reducing the severity and number of violations of the [NAAQS]," *id.* § 7506(c)(1)(A), MPOs must revise their SIPs if and when EPA revises the NAAQS for a relevant pollutant. In so doing, an MPO must first propose its revised plan to EPA and demonstrate that it adheres to the new NAAQS. *Id.* § 7506(c)(8). EPA must then present the new plan to the public for comment, *id.* § 7506(c)(8)(A)(iv)(III), after which time the plan may be adopted, *id.* § 7506(c)(8)(B)(i).

In 1997, EPA revised the NAAQS for ground-level ozone, changing the standard from 0.12 parts per million over a one-hour time frame to the more stringent 0.08 parts per million over an eight-hour time frame. 62 Fed. Reg. At 38,856 (1997). This revision triggered the implementation process described above. Every SIP that covers a nonattainment area (i.e., any area that does not meet the new 8-hour ozone standard) must be revised so that its transportation plans follow the new, stricter NAAQS. The purpose of 40 C.F.R. § 93.109 is to provide MPOs with an interim test to take the place of current SIPs (based on one-hour NAAQS) until the new SIPs (based on eight-hour NAAQS) are approved. 40 C.F.R. § 93.109. By its terms, section 93.109(e)(2)(v) allows "interim emissions tests" not contained in the approved SIP to supersede motor vehicle emissions budgets ("MVEBs"), which establish a ceiling for emissions from motor vehicle sources and which are contained in the approved SIP. An MVEB may only be superseded, however, when the budget "in the 1-hour ozone applicable implementation plan . . . is not the appropriate test and the interim emissions tests are more appropriate to ensure that the transportation plan . . . will not create new violations,

worsen existing violations, or delay timely attainment of the 8-hour ozone standard." 40 C.F.R. § 93.109(e)(2)(v).

EPA justifies these interim tests because, it argues, they are more stringent than the vehicle emissions budgets in the approved SIPs that are based on the previous and less stringent one-hour ozone NAAQS. Section 93.109(e)(2)(v) calls for a test "more appropriate to ensure" the transportation plan "will not create new violations." While this reasoning may very well provide a sound means to transition from a SIP covering old NAAQS to a SIP incorporating new NAAQS, it is simply not provided for in the Clean Air Act and runs afoul of its express prohibition that "[n]o [MPO] . . . shall give its approval to any project, program, or plan which does not conform to an implementation plan approved or promulgated under section 7410 of this title." 42 U.S.C. § 7506(c)(1). Under the terms of the Act, there is no need for an interim test during some contemplated transition period between the dates of approved SIPs. A current SIP, even one tied to outdated NAAQS, remains in force until replaced by another but later-approved SIP. The Clean Air Act provides that the current SIPs are legally sufficient until they are replaced by new SIPs. As petitioners correctly argue, the challenged interim rule, which purports to create a new standard to which transportation plans must conform, violates the Act's requirement that transportation plans conform to an approved SIP, 42 U.S.C. § 7506(c). There is no allowance under the Act for interim tests, and we have previously determined that an EPA regulation may not allow a conformity provision to supersede an approved SIP. *See EDF II*, 167 F.3d at 651 (citing 42 U.S.C. § 7506(c)(1), which "requires conformity determinations to be based on a SIP 'approved or promulgated under [42 U.S.C. § 7410]' where such a SIP exists" and 42 U.S.C. § 7506(c)(2), which "requir[es] transportation plans, programs, and projects

'to conform to any applicable implementation plan in effect under [42 U.S.C. § 7506]'").

Given the plain language of 42 U.S.C. § 7506(c)(1), we need not reach beyond the first step of *Chevron*'s inquiry. Congress has spoken directly to the issue presented by petitioners and we must therefore give effect to its unambiguously expressed intent. *Chevron,* 467 U.S. at 842. We may look to EPA's interpretation of its own regulation only if the statute is ambiguous, but it is not in this case. EPA's rule may be more stringent and even arguably better for the environment than what was required by Congress. If so, the Agency ought to make its argument to Congress, which unambiguously required that conformity be based on "an implementation plan approved or promulgated under section 7410." *Id*. "EPA may not 'avoid the Congressional intent clearly expressed in the text simply by asserting that its preferred approach would be better policy.'" *Friends of the Earth, Inc. v. EPA*, 446 F.3d 140, 145 (D.C. Cir. 2006) (quoting *Engine Mfrs. Ass'n v. EPA*, 88 F.3d 1075, 1089 (D.C. Cir. 1996)).

In a similar case, we held that regulations allowing states to demonstrate conformity based on motor vehicle emissions budgets in SIPs that have been submitted to EPA, but not yet approved, violated the Act. In *EDF II*, EPA promulgated a rule that allowed states to use MVEBs from SIPs that EPA had not approved but was considering, if the submitted SIP demonstrated that it was lowering emissions from levels allowed in the approved SIP. We stated that although "it may be true that plans and programs conforming to a SIP revision under [the EPA rule in question] will not cause, worsen, or prolong violations of air quality standards, . . . the statute nevertheless requires conformity determinations to be

based on a SIP 'approved or promulgated under section 7410 of this title.'" *EDF II*, 167 F.3d at 651 (quoting 42 U.S.C. § 7506(c)(1)) (quotation marks and citation omitted). We concluded that "[b]ecause [the regulation in question] would allow a submitted but unapproved SIP revision to supersede an approved SIP, it violates the Clean Air Act." *Id*. In *EDF II,* the submitted MVEBs, like the interim tests here, were more stringent and, in the Agency's view, better suited to protect the environment. In *EDF II*, as here, EPA advanced a reasonable policy justification for deviating from the plain language of 42 U.S.C. § 7506(c)(1). And in *EDF II*, as here, we upheld the plain language of the text, as required by *Chevron*.

In a direct rebuff to the argument EPA now urges upon us, the Agency acknowledged that "using updated budgets may be preferable," but that the "EPA does not believe that it is legal to allow a submitted SIP to supersede an approved SIP for years addressed by the approved SIP." 62 Fed. Reg. at 43,783. This interpretation was offered by EPA in response to arguments from commenters that newly submitted SIPs often provide a more realistic picture of the future than approved SIPs and may in fact be more accurate, because they are "based on the area's latest planning assumptions." *Id.*

In the same context, the Agency has also stated that "Clean Air Act section 176(c) [42 U.S.C. § 7506(c)] specifically requires conformity to be demonstrated to *approved SIPs*. SIP revisions that EPA has approved under Clean Air Act section 110 [42 U.S.C. § 7410] are enforceable and cannot be relieved by a submission, even if that submission utilizes better data." 62 Fed. Reg. at 43,783 (emphasis added). We agree.

Finally, EPA argues that it can implement interim tests even though they are not part of the approved and currently

applicable SIPs because the section of the SIP in question is no longer applicable. It is no longer applicable, EPA argues, because EPA has changed the ozone standard from one-hour to eight-hours. However, it is settled law that "current SIPs remain in force until EPA grants formal approval to a revision." *Duquense Light Co. v. EPA*, 698 F.2d 456, 471 (D.C. Cir. 1983); *see also Train v. Natural Res. Def. Council Inc.*, 421 U.S. 60, 98 (1975). "[T]he approved SIP is the applicable implementation plan during the time a SIP revision proposal is pending." *General Motors Corp. v. United States*, 496 U.S. 530, 540 (1990). This language is dispositive. Even when an ozone NAAQS has been revised and the latest approved SIP contains standards that are outdated in the sense that they are not based on the new studies that led to the revised NAAQS, it is the last approved SIP that nonetheless remains the applicable SIP until it too has been not only revised but approved.

B. *40 C.F.R. § 93.119(b)(2), (d), and (e)*

The petitioners next challenge 40 C.F.R. § 93.119(b)(2), (d), and (e), which provide that in certain nonattainment areas a conformity determination may be made using one of two interim tests.[2] Under this regulation, an MPO may demonstrate that a transportation plan for an applicable area conforms to the Clean Air Act if that plan passes either the "build/no build test"[3] or "the baseline year test."[4] Under the build/no build test,

---

[2] These tests apply to "marginal and below ozone nonattainment areas," 40 C.F.R. § 93.119(b)(2). Petitioners challenge the tests as they apply to marginal areas containing coarse particulate matter, fine particulate matter, and lower than moderate ozone nonattainment areas.

[3] "(i) The emissions predicted in the "Action" scenario are not greater than the emissions predicted

a plan or project conforms to the Act if it will not result in additional total emissions from the nonattainment area. In other words, if the total emissions in the area will remain the same whether the MPO builds or does not build the project in question, it will be deemed conforming. Under the baseline year test, a plan or project conforms to the Act if the total emissions from an area, including emissions added by the proposed plan, will not exceed emissions limitations set in prior years—so-called "baseline years." In some ozone nonattainment areas, EPA requires that conformity be based on both tests. *See* 40 C.F.R. § 93.119(b)(1).

While petitioners do not object to use of the baseline year test alone, they argue that allowing an MPO to use only the build/no build test in any nonattainment area violates the Act because in some circumstances that test allows transportation plans that do not reduce mobile source emissions to be deemed conforming. That, they argue, runs afoul of the Act's requirement that "conformity to an implementation plan's *purpose* of eliminating or reducing . . . violations of the national ambient air quality standards and achieving expeditious

---

in the "Baseline" scenario, and this can be reasonably expected to be true in the periods between the analysis years;" 40 C.F.R. § 93.119(b)(2) ("build/no build test").

[4] "(ii) The emissions predicted in the "Action" scenario are not greater than:
  (A) 1990 emissions, in areas for the 1-hour ozone NAAQS as described in § 93.109(c); or
  (B) 2002 emissions, in areas for the 8-hour ozone NAAQS as described in § 93.109(d) and (e)." 40 C.F.R. § 93.119(b)(2) ("baseline year test").

attainment of such standards." 42 U.S.C. § 7506(c)(1)(A) (emphasis added). According to petitioners, this section requires that *every* transportation plan must result in mobile source emission reductions to show conformity to a SIP. EPA argues, and we agree, that conformity to a SIP can be demonstrated by using the build/no build test, even if individual transportation plans do not actively reduce emissions.

Although the Act states that *SIPs* must reduce violations, and therefore emissions, *see* 42 U.S.C. § 7506(c)(1)(A), it is notably silent on whether *transportation plans themselves*, which are but one part of the SIP, must reduce emissions. Because the "Act 'is silent . . . with respect to the specific issue' at hand, the [Agency] may exercise its reasonable discretion in construing the statute." *Bldg. Owners and Managers Ass'n Intern. v. FCC*, 254 F.3d 89, 93-94 (D.C. Cir. 2001) (quoting *Chevron*, 467 U.S. at 842-43). The Act specifically gives EPA authority to "promulgate . . . criteria and procedures for determining conformity . . . in general," 42 U.S.C. § 7506(c)(4)(A), and to "demonstrat[e] and assur[e] conformity in the case of transportation plans," *id.* at (c)(4)(B). It is under this authority that EPA promulgated section 93.119 to "determin[e] conformity of federal actions to state or federal implementation plans." 40 C.F.R. § 93.119. EPA has authority to establish conformity criteria as long as those criteria do not contravene the purpose of reducing emissions. *See* 42 U.S.C. § 7506(c)(1)(A). EPA correctly argues that mobile source emissions standards, like those provided in transportation plans, constitute only one part of the total emissions standards allowed by a SIP. The remaining part is comprised of stationary sources. *See id.* at (a)(2)(c); 49 U.S.C. § 5304(b); 40 C.F.R. § 93.101. Under EPA's argument, a SIP could lower total overall emissions by reducing stationary source emissions while leaving mobile source emissions unchanged. Resp. Br. at 48. In such cases the build/no build test would conform to a SIP's

purpose of reducing overall emissions. Absent language in the Act requiring transportation plans to actively reduce mobile source emissions, we uphold EPA's reasonable interpretation of the Act under *Chevron*.

In *EDF I* we addressed a similar issue. There, petitioners challenged a regulation that allowed EPA to promulgate transportation plans that "d[id] not reduce emissions," arguing that it violated section 7506(c)(3)(A), which requires transportation plans to "contribute to annual emissions reductions" during an interim period in order for the plan to be deemed conforming. 82 F.3d at 460 (quoting 42 U.S.C. § 7506(c)(3)(A)). We agreed with EPA "that plans and improvement programs may contribute to emissions reductions by *avoiding* or *reducing increases* in emissions over the years," *id.* at 459 (emphasis added), because although the statute "require[d] reductions in [several pollutants]," it "d[id] not require that the emissions come entirely from mobile sources," *id.* at 460. Further, we noted that a "requirement that the transportation plan or program provide all the statutorily required reductions would seem to impinge on the prerogative of States to determine how and where to comply with the Act's emissions reduction requirements." *Id.* Here, we face a similar situation, and our answer remains the same. It is reasonable for EPA to allow conformity where mobile sources do not reduce emissions because the Act "do[es] not require that the emissions come entirely from mobile sources." *Id.*

In *EDF II,* we reviewed a regulation that allowed MPOs to adopt a plan "'even if [the plan's] conformity status is currently lapsed.'" 167 F.3d at 645 (quoting 40 C.F.R. § 93.121(a)(1)). This allowed "officials . . . [to] approve a transportation project . . . even if the plan and program no longer conform[ed] at the time of project approval." *Id.* In that

case, we ruled that "a 'conforming' transportation project is one that will contribute to 'eliminating or reducing the severity and number of violations of the [NAAQS] and achieving expeditious attainment of such standards . . . .'" *EDF II*, 167 F.3d at 647 (quoting 42 U.S.C. § 7506(c)(1)(A)) (brackets omitted). This approach is best understood in the context of our previous holding in *EDF I* that contributing to reductions can reasonably mean *avoiding increases* in emissions over the years. 82 F.3d at 460. The conformity provision does "not necessarily requir[e] the reduction of emissions attributable to the plan or program standing alone." *Id.* at 460. Our statement in *EDF II* is consistent with our earlier holding and does not diminish our responsibility in this case to uphold an agency's reasonable interpretation of a statute that is silent or ambiguous as to the contested issue. [5]

## IV.

---

[5] Petitioners also argue that 40 C.F.R. § 93.119(b)(2), (d), and (e) violate 42 U.S.C. § 7506(c)(1)(B). Petitioners argue that EPA conceded that a transportation plan that passed only the build/no build test "could fail to meet the statutory requirement that activities not contribute to violations of the standard." Pet. Reply Br. 17 (citing Fed. Reg. 40,018 (July 1, 2004)). However, this argument was not properly made until the reply brief. As we have held on various occasions, "[i]ssues may not be raised for the first time in a reply brief." *Rollins Env. Services (NJ) Inc. v. EPA*, 937 F.2d 649, 653 n.2 (D.C. Cir. 1991); *see also McBride v. Merrell Dow & Pharmaceuticals, Inc.*, 800 F.2d 1208, 1210-11 (D.C. Cir. 1986); *Asociacion de Compositores v. Copyright Royalty Tribunal*, 809 F.2d 926, 928 (D.C. Cir. 1987). Although petitioners pointed to evidence in support of their argument in the fact section of their initial brief, the argument itself must be introduced in an opening brief. *See City of Nephi v. FERC*, 147 F.3d 929, 933 n.9 (D.C. Cir. 1998) ("By merely informing the court in the statement of facts in its opening brief . . . Nephi failed properly to raise this argument.").

We grant the parties' petition for review and hold that section 93.109(e)(2)(v) of EPA's regulations is unlawful because it allows conformity to be shown based on a test not within an applicable SIP in contravention of section 7506(c)(1) of the Clean Air Act. We remand this section for the Agency to align the regulation with the above provision of the Act. We deny the parties' petition to review section 93.119(b)(2), (d), and (e) because it does not violate the Act. Finally, we do not have jurisdiction to examine the parties' petition to review section 93.118(b), (d), and (e)(6) because the petition was not filed before the sixty day statutory review period had run.

Petitioners' challenges are therefore granted in part, denied in part, and dismissed in part. 40 C.F.R. § 93.109(e)(2)(v) is vacated and remanded.