# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2008     Decided December 19, 2008

No. 02-1135

SIERRA CLUB,
PETITIONER

v.

ENVIRONMENTAL PROTECTION AGENCY
AND STEPHEN L. JOHNSON, ADMINISTRATOR,
ENVIRONMENTAL PROTECTION AGENCY,
RESPONDENTS

AMERICAN CHEMISTRY COUNCIL, ET AL.,
INTERVENORS

———

Consolidated with Nos. 03-1219, 06-1215, 07-1201

———

On Petitions for Review of a Final Action
of the Environmental Protection Agency

———

*James S. Pew* and *Keri N. Powell* argued the cause and filed the briefs for petitioner.

*Daniel R. Dertke*, Attorney, U.S. Department of Justice, argued the cause for respondent. With him on the brief were *John C. Cruden*, Deputy Assistant Attorney General, and *Sheila*

*Igoe*, Counsel, U.S. Environmental Protection Agency.

*Leslie S. Ritts, Charles H. Knauss*, *Sandra P. Franco*, *Lorane F. Hebert*, *Leslie A. Hulse*, *Susan T. Conti*, *John P. Wagner*, *William H. Lewis Jr.*, *Thomas J. Graves*, *Richard S. Wasserstrom*, and *Maurice H. McBride* were on the brief for intervenors in support of respondent. *Sam Kalen*, *Michael A. McCord*, *Jeffrey C. Nelson*, *Richard A. Penna*, *Michael B. Wigmore*, *David F. Zoll* entered appearances.

Before: ROGERS, TATEL, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court by *Circuit Judge* ROGERS.

Dissenting opinion by *Senior Circuit Judge* RANDOLPH.

ROGERS, *Circuit Judge*: Petitioners challenge the final rules promulgated by the Environmental Protection Agency exempting major sources of air pollution from normal emission standards during periods of startups, shutdowns, and malfunctions ("SSM") and imposing alternative, and arguably less onerous requirements in their place.[1] Because the general duty that applies during SSM events is inconsistent with the plain text of section 112 of the Clean Air Act ("CAA"), even accepting that "continuous" for purposes of the definition of "emission standards" under CAA section 302(k) does not mean unchanging, the SSM exemption violates the CAA's requirement that some section 112 standard apply continuously. Accordingly, we grant the petitions and vacate the SSM exemption.

**I.**

---

1  40 C.F.R. § 63.6(e)(l)(i);, (f)(1), and (h)(1).

CAA section 112 designates over one hundred pollutants as "hazardous," 42 U.S.C. § 7412(b)(1), and directs the Administrator of EPA to list all categories of "major sources" of hazardous air pollutants ("HAPs"), *id.* § 7412(c)(1), and to establish for each "emissions standards" requiring "the maximum degree of reduction in emissions," *id.* § 7412(d)(2). These controls are referred to as maximum achievable control technology ("MACT") standards. *See Natural Resources Def. Council v. EPA*, 489 F.3d 1364, 1368 (D.C. Cir. 2007). Section 112 also sets a "MACT floor," *id.*, requiring that standards "shall not be less stringent than the emission control that is achieved in practice by the best controlled similar source," 42 U.S.C. § 7412(d)(3). After eight years, under section 112(f), EPA is to revisit and potentially revise the emissions standards for each source category to ensure that they "provide an ample margin of safety to protect public health," *id.* § 7412(f)(2)(A). "Emission standard" is defined in section 302(k) as "a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter." 42 U.S.C. § 7602(k).

In addition to revising section 112, the 1990 Amendments also added Title V, which establishes a permit program to better monitor compliance with emissions standards. "Each permit . . . shall include enforceable emission limitations and standards, a schedule of compliance, . . . and such other conditions as are necessary to assure compliance with applicable requirements of this chapter." *Id.* § 7661c(a). Sources are required to certify that they are in compliance with the applicable requirements of the permit "and to promptly report any deviations from permit requirements to the permitting authority." *Id.* § 7661b(b)(2).

Title V further creates a "permit shield" for sources, ensuring that compliance with the permit is "deemed compliance with other applicable provisions" of the CAA. *Id.* § 7661c(f). "Any permit application, compliance plan, permit, and monitoring or compliance report" under Title V must be "ma[d]e available to the public." *Id.* § 7661a(b)(8).

In the 1970s EPA had determined that excess emissions during SSM periods are not considered violations of CAA emissions standards under section 111.[2] Although sources were "exempt[ed] from compliance with numerical emissions limits" during SSM events, 42 Fed. Reg. 57,125, EPA required that "[a]t all times, including periods of [SSM], owners and operators shall, to the extent practicable, maintain and operate any affected facility including associated air pollution control equipment in a manner consistent with good air pollution control practice for minimizing emissions," 40 C.F.R. § 60.11(d). EPA refers to sources' obligation to minimize emissions to the greatest extent possible as the "general duty" standard. *See, e.g.*, 70 Fed. Reg. 43,992, 43,993 (July 29, 2005).

In 1994, EPA adopted the SSM exemption for section 112. *National Emission Standards for* [*HAPs*] *for Source Categories: General Provisions*, 59 Fed. Reg. 12,408 (Mar. 16, 1994) ("1994 Rule").[3] Each source was thus exempted from the numerical

---

2 *Standards of Performance for New Stationary Sources*, 42 Fed. Reg. 57,125 (Nov. 1, 1977); *see*, *e.g.*, 51 Fed. Reg. 27,956, 27,970 (Aug. 4, 1986). Section 111 left to the Administrator's discretion the establishment of emissions standards for pollutants from sources while section 112 mandated the establishment of emissions standards for over 100 HAPs. *See New Jersey v. EPA*, 517 F.3d 574, 580 n.1 (D.C. Cir. 2008).

3 "The General Provisions have the legal force and effect of standards, and they may be enforced independently of relevant

limits set for emission control pursuant to section 112 and only the general duty would apply.  However, in order to avoid a blanket exemption, EPA required each source to develop and implement an SSM plan.  "The purpose of the plan [was] for the source to demonstrate how it will do its reasonable best to maintain compliance with the standards, even during [SSMs]." *Id.* at 12,423. Each SSM plan was to "describe[], in detail, procedures for operating and maintaining the source during periods of [SSM] and a program of corrective action for malfunctioning process and air pollution control equipment used to comply with the relevant standard." *Id*. at 12,439.  The EPA Administrator could require changes to the SSM plan if it was inadequate.  *Id*. at 12,440.  The plan was incorporated by reference into the source's Title V permit, 59 Fed. Reg. at 12,439, and thereby subject to prior approval by the State permitting authority, 58 Fed. Reg. 42,760, 42,768 (Aug. 11, 1993).  Under the CAA, the SSM plan was to be made publicly available, 42 U.S.C. § 7661a(b)(8), and served as a safe harbor during SSM events, *id*. § 7661c(f).

In 2002, EPA removed the requirement that a source's Title V permit incorporate the SSM plan, and instead determined that a source's Title V permit must simply require the source to adopt an SSM plan and to abide by it.[4]  Because the SSM plan was no longer itself part of the permit and could be revised

standards."  59 Fed. Reg. at 12,408.  The requirements of the General Provisions are superceded by any category-specific standard. *See id.* at 12,409.

4 *National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions; and Requirements for Control Technology Determinations for Major Sources in Accordance with Clean Air Act Sections, Sections 112(g) and 112(j)*, 67 Fed. Reg. 16,582 (Apr. 5, 2002) ("2002 Rule").

without formal revision of the permit, it was no longer subject to prior approval, and was no longer eligible for the permit shield. *Id.* Additionally, "to minimize the unnecessary production of the SSM plan," 66 Fed. Reg. 16,318, 16,326 (Mar. 23, 2001), the SSM plan was to be made publicly available only upon request. *Id.* The Sierra Club sought reconsideration and filed a petition for review of the 2002 Rule, and as part of a settlement agreement, EPA proposed "modest" changes to the SSM plan regulations, 67 Fed. Reg. 72,875, 72,879 (Dec. 9, 2002), namely that sources must submit their SSM plans to the permitting authority along with their Title V permit applications.

In the final rule adopted in 2003, however, EPA "decided instead to adopt a less burdensome approach,"[5] requiring members of the public to make a "specific and reasonable request" of the permitting authority to request the SSM plan from the source. 68 Fed. Reg. at 32,591. The Sierra Club challenged the 2003 Rule in a new petition for review, which was consolidated with its previous challenge. The Natural Resources Defense Council ("NRDC") also filed a petition for reconsideration on the ground that any limitation on the public availability of the SSM plans was unlawful. EPA agreed to take comment on the new SSM provisions, and the consolidated cases were held in abeyance pending reconsideration.

In 2006, EPA retracted the requirement that sources

---

[5] *National Emission Standards for Hazardous Air Pollutants for Source Categories: General Provisions; and Requirements for Control Technology Determinations for Major Sources in Accordance with Clean Air Act Sections, Sections 112(g) and 112(j)*, 68 Fed. Reg. 32,586, 32,591 (May 30, 2003) ("2003 Rule")

implement their SSM plans during SSM periods.[6] According to EPA, "[t]his is consistent with the concept that the plan specifics are not applicable requirements [under Title V] and thus cannot be required to be followed. Nonetheless, the general duty to minimize emissions remains intact and is the applicable requirement." 70 Fed. Reg. 43,992, 43,994 (Jul. 29, 2005). Post-event reporting requirements provided that sources must describe what actions were taken to minimize emissions "any time there is an exceedance of an emission limit . . . and thus a possibility that the general duty requirement was violated." 71 Fed. Reg. at 20,448. EPA clarified that reporting and recordkeeping is only required when a start up or shut down caused the applicable emission standard to be exceeded, and "for any occurrence of malfunction which also includes potential exceedances." *Id.* at 20,447. EPA also eliminated the requirement that the Administrator obtain a copy of a source's SSM plan upon request from a member of the public and determined that the public may only access those SSM plans obtained by a permitting authority. The permitting authorities, in turn, "still have the discretion to obtain plans requested by the public, but will not be required to do so." *Id.*

Petitioners[7] now contend that the exemption from

_____

6 *National Emission Standards for Hazardous Air Pollutants: General Provisions*, 71 Fed. Reg. 20,446, 20,447 (Apr. 20, 2006) ("2006 Rule").

7 The Coalition for a Safe Environment ("CFASE") petitioned for reconsideration of EPA's conclusion that a source's "Title V permit will assure its compliance with the general duty to minimize emissions during [SSM] events merely by requiring the facility to file a report *after* such an event." CFASE, Comment Letter, Petition for Reconsideration of "National Emission Standards for Hazardous Air Pollutants: General Provisions," 71 Fed. Reg. 20,446 (June 19, 2006). EPA denied reconsideration, 72 Fed. Reg. 19,385

compliance with emissions standards during SSM events is both unlawful and arbitrary, and that the 2002, 2003, and 2006 rules unlawfully and arbitrarily fail to "assure compliance" with "applicable requirements" under Title V. Upon determining that we have jurisdiction, we turn to petitioners' challenges to the rules.

**II.**

The CAA provides that "[a]ny petition for review under this subsection shall be filed within sixty days from the date notice of such promulgation, approval, or action appears in the Federal Register." 42 U.S.C. § 7607(b)(1). EPA maintains that petitioners have waived their challenge to the SSM exemption by not challenging the 1994 Rule articulating that the general duty standard replaces section 112 emissions standards during SSM events. Petitioners, noting that "EPA received repeated comments on the illegality of its SSM exemption in the course of its rulemaking -- which covered more than six years, generated three separate proposals and necessitated three petitions for reconsideration," Petrs. Br. 29, respond that "rulemakings that significantly change the context for a regulatory provision can re-open it for comment, even if an agency does not change the provision itself," *id.*, and that this is what happened here.

Under the reopening doctrine, the time for seeking review starts anew where the agency reopens an issue "by holding out the unchanged section as a proposed regulation, offering an explanation for its language, soliciting comments on its substance, and responding to the comments in promulgating the

(Apr. 18, 2007), and CFASE petitioned for review. This petition along with the other challenges to the 2006 Rule were consolidated with the previous petitions for review.

regulation in its final form." *Am. Iron & Steel Inst. v. EPA*, 886 F.2d 390, 397 (D.C. Cir. 1989); *see P&V Enters. v. U.S. Army Corps of Eng'rs.*, 516 F.3d 1021, 1023-24 (D.C. Cir. 2008); *Ohio v. EPA*, 838 F.2d 1325, 1328 (D.C. Cir. 1988). In its 2003 rulemaking, EPA discussed revisions to its SSM plan requirements, but asserted that "[n]othing in these revisions is intended . . . to change the general principle that compliance with a MACT standard is not mandatory during periods of [SSM]." 67 Fed. Reg. at 72,880. In response to Sierra Club's comments questioning the legality of the SSM exemption, EPA stated: "We believe that we have discretion to make reasonable distinctions concerning those particular activities to which the emission limitations in a MACT standard apply, and we, therefore, disagree with the legal position taken by the Sierra Club." 2003 Rule, 68 Fed. Reg. at 32,590. However, "when the agency merely responds to an unsolicited comment by reaffirming its prior position, that response does not create a new opportunity for review. Nor does an agency reopen an issue by responding to a comment that addresses a settled aspect of some matter, even if the agency had solicited comments on unsettled aspects of the same matter." *Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1213 (D.C. Cir. 1996); *see also Am. Iron*, 886 F.2d at 398. Moreover, when EPA received unsolicited comments on this issue in its 2006 rulemaking, it explained that "[t]hese commenters raise issues that are outside of the scope of this rulemaking. The general duty provision has been in place since 1994." 71 Fed. Reg. at 20,449; *cf. PanAmSat Corp. v. FCC*, 198 F.3d 890, 897 (D.C. Cir. 1999). Such agency conduct is not tantamount to an *actual* reopening.

However, petitioners contend that the 2006 Rule "has *completely* changed the regulatory context for its SSM exemption by stripping out virtually all of the SSM plan requirements that it created to contain that exemption." Petrs.

Br. at 29.  In *Kennecott*, this court established that an "agency's decision to adhere to the *status quo ante* under changed circumstances" can "constructively reopen[]" a rule "by the change in the regulatory context."  88 F.3d at 1214.  A constructive reopening occurs if the revision of accompanying regulations "significantly alters the stakes of judicial review," *id.* at 1227, as the result of a change that "could have not been reasonably anticipated," *Envtl. Def. v. EPA*, 467 F.3d 1329, 1334 (D.C. Cir. 2006).

Petitioners recount, and EPA does not dispute, that:

> To avoid creating a "blanket exemption from emission limits," EPA's 1994 rule required that (1) sources comply with their SSM plans during periods of SSM; (2) SSM plans be reviewed and approved by permitting authorities like any other applicable requirement; (3) SSM plans be unconditionally available to the public, which could participate in evaluating their adequacy in the permit approval process; and (4) SSM plan provisions be directly enforceable requirements.  5 9 Fed. Reg. at 12423 [].  In the rulemakings challenged here, however, EPA has eliminated <u>all</u> of these safeguards.  SSM plans are no longer enforceable requirements, and EPA has expressly retracted the requirement that sources comply with them.  71 Fed. Reg. at 20447 [].  EPA also has eliminated any requirement that SSM plans be vetted for adequacy and any opportunity for citizens to see or object to them. *Id.* [].

Petrs. Br. at 29-30.  These are not mere "minor changes," *Envtl. Def.*, 467 F.3d at 1333.  In so modifying the SSM plan requirements, EPA has constructively reopened the SSM exemption.  While the text of the general duty itself did not

change, "EPA has <u>completely</u> changed the regulatory context for its SSM exemption by stripping out virtually all of the SSM plan requirements that it created to contain the exemption." Petrs. Br. at 29 (emphasis in original).

EPA's modifications to the SSM plan requirements created a different regulatory construct as to the means of measuring compliance with the general duty. Because the general duty does not include any "numerical emissions limits," 42 Fed. Reg. at 57,125, the general duty assumes new shape depending on the means used to capture that standard. In 1994, EPA determined that compliance with the general duty on its own was insufficient to prevent the SSM exemption from becoming a "blanket" exemption. It established the SSM plan requirements precisely because the general duty was inadequate. Now EPA has removed these necessary safeguards. Because the general duty was defined in 1994 through and housed in the four walls of the SSM plan requirements, EPA's modifications to those requirements have eliminated the only effective constraints that EPA originally placed on the SSM exemption. The fact that the regulatory terms defining "the general duty" itself are unchanged is legally irrelevant because the other "extensive changes . . . significantly alter[ed] the stakes of judicial review," *Kennecott*, 88 F.3d at 1226-27. Just as the court in *Kennecott* agreed with industry that the agency had constructively reopened a regulation when it incorporated amended regulations that expanded available remedies and thus altered its financial incentives for challenging the regulation, so too here from the perspective of environmental petitioners' interests and allocation of resources the general duty "may not have been worth challenging in [1994], but the [revised] regulations gave [that duty] a new significance," *id.* at 1227. In *Kennecott*, there were "new and potentially more onerous provisions," *id.*, facing industry; here petitioners face a blanket exemption and a more

onerous task in effecting compliance with HAP emission standards during SSM events.

Although EPA asserts that "the duty to minimize emissions is not inextricably linked to the SSM plan," Resp. Br. at 24, the rulemaking record shows that "the general duty requirement and the SSM plan requirements were both elements of a package deal that EPA devised and sold to the public as adequate protection from [HAPs] during SSM events," Petrs. Reply Br. at 12. When commenters raised objections to the SSM exemption in 1994, EPA's direct response relied upon the SSM plan as a justification for the relaxed standard:

> The EPA believes, as it did at proposal, that the requirement for a[n] [SSM] plan is a reasonable bridge between the difficulty associated with determining compliance with an emission standard during these events and a blanket exemption from emission limits. The purpose of the plan is for the source to demonstrate how it will do its reasonable best to maintain compliance with standards, even during [SSMs]."

59 Fed. Reg. at 12,423. EPA attempts now to dismiss this statement as mere "inartful[] word[ing]," Resp. Br. at 27, but the fact that EPA's entire discussion of the proper standard to apply during SSM events invoked the SSM plan provisions confirms that the SSM plan and general duty standard are inextricably linked. Indeed, the explicit purpose of the SSM plan as devised in 1994 was to "ensure" that facility owners abide by the general duty. 59 Fed. Reg. at 12,439.

Shifting from a regulatory scheme based on a mandatory SSM plan that was part of a source's Title V permit, which is subject to prior approval with public involvement, *see* 42 U.S.C.

§§ 7661a(b)(6), to a regulatory scheme with a non-mandatory plan providing for no such approval or involvement but only after-the-fact reporting changed the calculus for petitioners in seeking judicial review, *id.*, and thereby constructively reopened consideration of the exemption from section 112 emission standards during SSM events. Petitioners' challenges to the SSM exemption are therefore timely.

## III.

On the merits, petitioners contend that EPA's decision to exempt major sources from compliance with section 112 emissions standards during SSM events is contrary to the plain text of the statute and arbitrary and capricious in any event. EPA and Industry Intervenor respond that EPA's general-duty requirement during SSM events is a lawful interpretation of the statute and a reasonable way to reconcile the need to minimize emissions with the inherent technological limitations during SSM events. Challenges to EPA's interpretation of the CAA are governed by *Chevron U.S.A., Inc. v. NRDC*, 467 U.S. 837, 842-843 (1984), in which "the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress." Only if the statute is silent or ambiguous on a particular issue, may the court defer to the agency's reasonable interpretation. *Id.* at 844. The CAA provides that the court may reverse any agency action found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A).

Section 112(d) provides that "[e]missions standards" promulgated thereunder must require MACT standards. 42 U.S.C. § 7412(d)(2). Section 302(k) defines "emission standard" as "a requirement established by the State or the Administrator which limits the quantity, rate, or concentration of emissions of air pollutants on a continuous basis, including

any requirement relating to the operation or maintenance of a source to assure continuous emission reduction, and any design, equipment, work practice or operational standard promulgated under this chapter." *Id.* § 7602(k). Petitioners contend that, contrary to the plain text of this definition, "EPA's SSM exemption automatically excuses sources from compliance with emission standards whenever they start up, shut down, or malfunction, and thus allows sources to comply with emission standards on a basis that is not 'continuous.'" Petrs. Br. at 23. EPA responds that the general duty that applies during SSM events "along with the limitations that apply during normal operating conditions, together form an uninterrupted, *i.e.*, continuous, limitation because there is no period of time during which one or the other standard does not apply," Respt.'s Br. at 31. "Although *Chevron* step one analysis begins with the statute's text," the court must examine the meaning of certain words or phrases in context and also "exhaust the traditional tools of statutory construction, including examining the statute's legislative history to shed new light on congressional intent, notwithstanding statutory language that appears superficially clear." *Am. Bankers Ass'n v. Nat'l Credit Union Admin.*, 271 F.3d 262, 267 (D.C. Cir. 2001) (citations and quotation marks omitted).

EPA suggests that the general duty is "part of the operation and maintenance requirements with which all sources subject to a section 112(d) standard must comply," Respt.'s Br. at 33, pointing to section 302(k)'s statement that an "emission standard" includes "any requirement relating to the operation or maintenance of a source to assure continuous emission reduction," 42 U.S.C. § 7602(k). Section 302(k)'s inclusion of this broad phrase in the definition of "emission standard" suggests that emissions reduction requirements "assure continuous emission reduction" without necessarily

continuously applying a single standard. Indeed, this reading is supported by the legislative history of section 302(k):

> By defining the terms 'emission limitation,' 'emission standard,' and 'standard of performance,' the committee has made clear that constant or continuous means of reducing emissions must be used to meet these requirements. By the same token, intermittent or supplemental controls or other temporary, periodic, or limited systems of control would not be permitted as a final means of compliance.

H.R. Rep. 95-294, at 92 (1977), *as reprinted in* 1977 U.S.C.C.A.N. 1077, 1170. "Congress's primary purpose behind requiring regulation on a continuous basis" appears, as one circuit has suggested, to have been "to exclude intermittent control technologies from the definition of emission limitations," *Kamp v. Hernandez*, 752 F.2d 1444, 1452 (9th Cir. 1985).

When sections 112 and 302(k) are read together, then, Congress has required that there must be continuous section 112-compliant standards. The general duty is not a section 112-compliant standard. Admitting as much, EPA states in its brief that the general duty is neither "a separate and independent standard under CAA section 112(d)," nor "a free-standing emission limitation that must independently be in compliance" with section 112(d), nor an alternate standard under section 112(h). Respt.'s Br. 32-34. Because the general duty is the only standard that applies during SSM events – and accordingly no section 112 standard governs these events – the SSM exemption violates the CAA's requirement that some section 112 standard apply continuously. EPA has not purported to act under section 112(h), providing that a standard may be relaxed "if it is not feasible in the judgment of the Administrator to prescribe or

enforce an emission standard for control of a [HAP]," *id.* § 7412(h)(1), based on either a (1) design or (2) source specific basis, *id.* § 7412(h)(2)(A), (B).

EPA's suggestion that it has "discretion to make reasonable distinctions concerning those particular activities to which the emission limitations in a MACT standard apply," 68 Fed. Reg. at 32,590, belies the text, history and structure of section 112. "In 1990, concerned about the slow pace of EPA's regulation of HAPs, Congress altered section 112 by eliminating much of EPA's discretion in the process." *New Jersey*, 517 F.3d at 578. In requiring that sources regulated under section 112 meet the strictest standards, Congress gave no indication that it intended the application of MACT standards to vary based on different time periods. To the contrary, Congress specifically permitted the Administrator to "distinguish among classes, types, and sizes of sources within a category or subcategory in establishing such standards," CAA § 112(d)(1), 42 U.S.C. § 7412(d)(1). Additionally, while recognizing that in some instances it might not be feasible to prescribe or enforce an emission standard under § 112, Congress provided in section 112(h) for establishment of "work practice" or "operational" standards instead, but, as petitioners point out, "strictly limited this exception by defining 'not feasible . . .' to include only [two types of] situations," Petrs. Br. 9, and did not authorize the Administrator to relax emission standards on a temporal basis. *See NRDC*, 489 F.3d at 1374.

In sum, petitioners' challenge to the exemption of major sources from normal emission standards during SSM is premised on a rejection of EPA's claim of retained discretion in the face of the plain text of section 112. "Where Congress explicitly enumerates certain exceptions to a general prohibition, additional exceptions are not to be implied, in the absence of a contrary legislative intent". *NRDC*, 489 F.3d at 1374 (quoting

*TRW Inc. v. Andrews*, 534 U.S. 19, 28 (2001)). The 1990 Amendments confined the Administrator's discretion, *see New Jersey*, 517 F.3d at 578, and Congress was explicit when and under what circumstances it wished to allow for such discretion, *id*. at 582. "EPA may not construe [a] statute in a way that completely nullifies textually applicable provisions meant to limit its discretion." *New Jersey*, 517 F.3d at 583 (quoting *Whitman*, 531 U.S. at 485).

Accordingly, we grant the petitions without reaching petitioners' other contentions, and we vacate the SSM exemption. *See New Jersey*, 517 F.3d at 583 (citing *Allied Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993)).

RANDOLPH, *Senior Circuit Judge*, dissenting: I do not agree that we have jurisdiction over Sierra Club's petition for judicial review. The original regulations at issue, 40 C.F.R. § 63.6(e)–(h) (1994), exempt periods of startup, shutdown, and malfunction from opacity and non-opacity emission standards. When EPA promulgated these regulations in 1994, Sierra Club took no legal action. Yet under the Clean Air Act a petition for judicial review of an EPA regulation must be filed within 60 days of the regulation's publication in the Federal Register. 42 U.S.C. § 7607(b)(1).

Of course an agency may give notice and ask for comment on whether an existing regulation should be modified or repealed or retained, or it may indicate in response to comments that it has reconsidered the regulation. *See Kennecott Utah Copper Corp. v. Dep't of Interior*, 88 F.3d 1191, 1214 (D.C. Cir. 1996). Or an agency may give its regulation new significance by altering other regulations incorporating it by reference. *See id.* at 1226–27. In any one of these situations the 60-day period would begin to run again. But nothing of the sort occurred here. According to Sierra Club, EPA's rulemakings in 2002, 2003, and 2006 rendered enforcement of the 1994 startup, shutdown, and malfunction regulations more difficult. Petr.'s Br. at 29. Even if true,[1] that could hardly have amounted to agency "action" re-promulgating the 1994 regulations, which is what § 7607(b)(1) requires as a prerequisite for judicial review. After

---

[1]The majority opinion makes a factual error when it suggests that the new startup, shutdown, and malfunction regulations have eliminated a prior requirement that EPA approve startup, shutdown, and malfunction plans in the course of its review of Title V permits. Maj. Op. at 12. In fact, the plans were merely incorporated by reference into Title V permits; there has never been any requirement that EPA review or approve the plans before approving permits. *See* 66 Fed. Reg. 16,318, 16,326 (2001); *see also* 40 C.F.R. § 63.6(e)(3)(viii) (1998); 67 Fed. Reg. 16,582, 16,587 (2002).

all, Sierra Club's complaint is not that the 1994 regulations are now hard to enforce; it is instead that the 1994 regulations are invalid and always have been. The recent rules did not alter the exemption for startup, shutdown, and malfunction events. The new rules simply modified requirements for each source's plan regarding implementation of the duty to minimize pollution during the exempt periods. Sierra Club had the option – which it exercised[2] – of challenging the new rules on the ground that the modifications will lead to unacceptable levels of pollution.

In *Kennecott*, regulated industries sought judicial review of an allegedly invalid regulation after changes in related regulations made its enforcement *more* likely and more punitive. Sierra Club has no comparable financial incentives capable of assessment by a court; instead, it presumably has an incentive to challenge any regulatory change that might lead to increased pollution. The majority's rationale implies that each time EPA changes an emissions regulation, it risks subjecting every related regulation to challenges from third parties. Such a regime, and the instability it generates, is intolerable. Perhaps that is why, until today, we have limited the constructive reopening doctrine to cases involving regulated entities. *See Envtl. Def. v. EPA*, 467 F.3d 1329, 1334 (D.C. Cir. 2006).

Although EPA did not reopen its 1994 regulations for judicial review, Sierra Club has another option: it may file a petition to rescind those regulations and, if EPA denies the petition, Sierra Club may seek judicial review of EPA's action.

---

[2]The majority opinion does not reach Sierra Club's argument that the recent rules fail to guarantee enforcement of applicable emissions standards and therefore violate Title V of the Clean Air Act.

*See, e.g.*, *Pub. Citizen v. Nuclear Regulatory Comm'n*, 901 F.2d 147, 152 (D.C. Cir. 1990).  There is no basis for permitting Sierra Club to circumvent that procedural requirement in this case.  *See Kennecott*, 88 F.3d at 1214.

There is another problem with the majority opinion. It disposes of the case with an argument not addressed in the brief of either party – namely, that § 112(h) of the Clean Air Act provides the only basis for EPA to impose a non-numerical emissions standard and that the 1994 regulations are unlawful because they do not comply with the requirements of § 112(h). Sierra Club mentions § 112(h), *see* Petr.'s Br. at 24, but its argument that the 1994 regulations are unlawful rests on § 302(k)'s requirement that "emission standards" must regulate air pollutants on a "continuous basis," *id.* at 23–24.  EPA refers to § 112(h) only to state that it is irrelevant to the question whether its "general duty to minimize" is an enforceable standard satisfying the statutory requirement to regulate sources on a continuous basis.  Resp.'s Br. at 33 n.5.  As we have recognized, a passing mention of an otherwise unbriefed issue does not normally suffice to preserve the issue.  *United States v. Haldeman*, 559 F.2d 31, 78 n.113 (D.C. Cir. 1976).[3]

---

[3]The majority attempts to shoehorn its holding into Sierra Club's "continuous basis" arguments, stating that it reads § 112 and § 302(k) together to "require[] that there must be continuous section 112-compliant standards."  Maj. Op. at 15. But the discussion of § 302(k)'s continuous basis requirement does no work in the majority's legal analysis; without the "continuous basis" requirement, the majority would still hold that EPA's standards must be "section 112-compliant." The majority's point is not that EPA has failed to regulate emissions sources on a continuous basis.  *See* Maj. Op. at 14 (stating that EPA need not continuously apply a uniform standard).  It is instead that the 1994 rule's "general duty to minimize" does not

Though there have been exceptions, we have generally declined to consider issues not briefed by the parties, especially when the issue is not easy or the record is long and complex, *cf. United States v. Pryce*, 938 F.2d 1343, 1347–48, 1351 (D.C. Cir. 1991), when doing so would be unfair to the respondent, *Envtl. Def. Fund, Inc. v. Costle,* 657 F.2d 275, 284 n.32 (D.C. Cir. 1981), or when the legal issue is particularly important. *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). Here, the question whether EPA's interpretation of § 112 is permissible is a difficult one, and both the record and the statute are complex. Here too, EPA has never had a fair opportunity to address the issue.

---

meet the requirements of § 112(h). Maj. Op. at 14–16.